Filed 6/28/24  P. v. Banerjee CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TATTVAJIT ANKUR BANERJEE,<br><br>    Defendant and Appellant. | A168466<br><br>(Contra Costa County<br>Super. Ct. No. 022300125) |

Defendant Tattvajit Ankur Banerjee was found incompetent to stand trial and committed to the Department of State Hospitals (Department).  The trial court determined Banerjee lacked the capacity to decide whether to take antipsychotic drugs, and without the drugs, Banerjee would likely suffer serious harm to her[1] physical or mental health.  The court ordered Banerjee to be involuntarily medicated under Penal Code section 1370, subdivision (a)(2)(B)(i)(I).[2]  On appeal, Banerjee argues the court's involuntary medication order is not supported by substantial evidence.  Banerjee further contends the court abused its discretion in declining counsel's request to

---

[1] The record reflects Banerjee identifies as a hermaphrodite and prefers the pronouns she/they.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

1

unshackle Banerjee at the involuntary medication hearing. Finally, Banerjee asserts the involuntary medication order should be vacated because the "institutional delay" in procuring the appellate record violated Banerjee's appellate rights. We affirm.

## BACKGROUND

In April 2023, Banerjee was found incompetent to stand trial and subsequently committed to the state hospital for a two-year period.[3]

### Psychiatric Evaluations

In conjunction with Banerjee's admission to the state hospital, on June 28, 2023, Alejandro Perez, M.D. conducted a psychiatric evaluation of Banerjee. Dr. Perez diagnosed Banerjee with schizoaffective disorder, bipolar type. Banerjee had a history of psychiatric treatment since 2007 and had been psychotically hospitalized at least 10 times. Dr. Perez described Banerjee as "paranoid, grandiose, tangential, and perseverative on interview." Review of Banerjee's medical records revealed a long history of " 'floridly delusional' " and " 'disorganized' " thinking. Banerjee claimed to have multiple Ph.D.'s, as well as medical and law degrees.

Dr. Perez conducted "face to face" assessments with Banerjee on June 28 and 29, 2023 to determine Banerjee's capacity to consent to antipsychotic medication since Banerjee had refused to comply with the antipsychotic treatment offered on those dates. At the time of the interviews, Banerjee had

---

[3] On our own motion, we take judicial notice of Banerjee's filing of a no issue appeal of the April 11, 2023 commitment order pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 in case No. A167973. On January 19, 2024, we notified Banerjee of the right to file a supplemental brief pursuant to *People v. Delgadillo* (2022) 14 Cal.5th 216, within 30 days. No supplemental brief was filed, thus we dismissed the appeal as abandoned on March 3, 2024. Accordingly, the April 11, 2023 commitment order is not addressed in the present appeal.

been untreated for at least six months. On both interview dates, Banerjee exhibited signs of delusions and paranoia. Banerjee was fixated on the claim that her "records [were] being falsified and the sheriffs and family members" were "actively persecuting" Banerjee because they were "corrupt" and wanted "to sex traffic" Banerjee. Dr. Perez advised Banerjee of the risks and benefits of the proposed antipsychotic treatment. Banerjee stated that she would "never comply" with such treatment because "antipsychotics are lethal and kill '40 percent' of the people taking them." The conversation "inevitably derailed into delusions."

Dr. Perez reported that due to Banerjee's psychosis, she suffers from "chronic thought disorder and speech disorder exemplified by tangential thinking, perseveration, rambling dialogues, and decreased concentration." Banerjee's "chronic state of thought disturbance" rendered her "unable to rationally communicate interpersonally since her thought content is pervaded by delusions." Dr. Perez opined that—based on Banerjee's "inability to assess the risk/benefits of offered treatment, her inability to convey rational understanding [of] how medications would apply in her situation, and her inability to reasonably assess the risks and benefits of treatment"—she is "incapable of having capacity to make decisions regarding antipsychotic medication treatment."

Dr. Perez opined that antipsychotic medication was the primary and most effective treatment for schizoaffective disorder, bipolar type. No other method has demonstrated effectiveness in treating psychosis like antipsychotic medication. Dr. Perez determined Banerjee was presently suffering "profound adverse effects" in her untreated state, including chronic thought and speech disorders, which were exemplified by "tangential thinking, perseveration, rambling dialogues, . . . decreased concentration,"

3

"chronic and distressing delusions of persecution," "incessant ramblings about paranoid delusions," and the inability to rationally communicate interpersonally. Banerjee has "a brain disease with a deteriorating course if left untreated" that is "seriously harmful." Dr. Perez explained that untreated psychosis, worsens and becomes treatment-resistant, meaning future attempts to treat the disease may become futile "despite intense medication regimes." Banerjee's tangential thinking and persistent perseveration into delusions signaled her condition was "substantially deteriorating." Dr. Perez ultimately determined that antipsychotic medications were "medically necessary to control [the] patient's psychosis and there are no viable alternatives to antipsychotic medications."

Thereafter, the Department filed a petition for an order to compel Banerjee to undergo involuntary treatment with antipsychotic medication.

### *Hearing on Petition for Involuntary Medication*

At the July 26, 2023 hearing on the Department's petition for involuntary administration of medication, the parties stipulated Dr. Perez was Banerjee's treating physician and that he qualified as an expert. Defense counsel, who was present in the courtroom, objected that Banerjee, who appeared via Zoom, was being shackled. The court explained it would "defer to the State Hospital as to their security assessment," adding it would revisit the matter if it became an issue affecting Banerjee's participation. The court further noted the hearing was not before a jury, and it appeared Banerjee could communicate with her counsel.

Dr. Perez testified Banerjee does not understand the benefits of treatment and does not have the capacity to make decisions about taking medications. He described Banerjee's "two main adverse effects" as

4

"significant perseveration"[4] and "significant persecutory beliefs," which created an "impaired ability to recognize reality."

Dr. Perez had recently become aware of Banerjee's plan to stop daily showering in order to "grow the microbiome" on the skin, which Banerjee believes has a beneficial health effect. Dr. Perez expressed concern that this plan was "unhygienic" and could negatively affect Banerjee's health and self-care in the future. Dr. Perez was also troubled by Banerjee's claims of being nutritionally deprived, losing 40 pounds and needing 18,000 calories daily due to a vegan diet—all of which had no basis in fact.

Dr. Perez explained that patients with severe mental illnesses like Banerjee's are prone to "engaging in violent behaviors, especially if they are in a decompensated state"; "[s]obriety and medication compliance is the standard of care" for psychotic patients. A distorted reality fuels hypervigilance and justification for aggression to protect oneself. "So this state of chronic paranoia and persecution can lead to aggressive outlashing statistically." Both schizophrenia and schizoaffective disorder are chronic conditions, which left untreated have a deteriorating effect; the delusions worsen by becoming "more pervasive and unrelenting," which in turn creates "fixed memories about the persecution." Dr. Perez opined it is probable Banerjee will suffer serious harm if not treated with antipsychotic medication.

The "vast majority" of persons in Banerjee's situation "will have a deteriorating mental state usually devolving into chronic homelessness, poor self-care and usually repeat criminal arrests." Dr. Perez based his testimony

---

[4] Dr. Perez testified that perseveration means "repeated [thoughts] about a topic without changes despite attempts to change the person's train of thought."

and evaluation upon his medical training, as well as his personal experience with "over 5,000" similarly situated patients.

On cross-examination, Dr. Perez clarified that Banerjee's delusional thought system and related symptoms were not new issues affecting her mental status overall. Dr. Perez confirmed there have been no problems with Banerjee complying with her medication regime, nor has there been any aggressive behavior, harboring of death/suicide/violence thoughts, or display of self-injurious behavior.

At the conclusion of the hearing, the court determined Banerjee did not have the capacity to consent to treatment and that her "mental disorder does require medical treatment with antipsychotic medication; and if it is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the defendant will result." The court found Banerjee lacked insight into "the underlying medical condition as well as the medication." The court noted, although concerns about side effects were "well placed," Banerjee's "underlying delusions about medication are unrelated to the actual medication side effects." In terms of serious harm to physical or mental health, the court based its finding on Banerjee's inability to participate in treatment due to "lack of focus," "significant persecutory beliefs" creating "psychological distress," and "persecutory beliefs" becoming more fixed over time if not treated. The court noted that abstaining from daily showering did not in itself indicate a lack of capacity or serious harm. However, what was described was "something far more extreme" than simply choosing not to shower. Rather, the reason given—facilitating growth of a microbiome—established "a purpose that could cause serious harm to" Banerjee.

*Trial Court's Order*

In a written order dated July 26, 2023, the court found "Banerjee lacks the capacity to make decisions regarding antipsychotic medication and if their mental disorder is not treated, serious harm to their physical or mental health is the probable result pursuant to . . . section 1370, subdivision (a)(2)(B)(i)(I)." The court ordered "Banerjee may be involuntarily administered antipsychotic medication in the dosage and frequency deemed necessary for a period not to exceed one year from the date of this order."

Banerjee filed a timely notice of appeal.

## DISCUSSION

Banerjee challenges the sufficiency of the evidence supporting the involuntary medication order. Banerjee further contends the court abused its discretion in declining counsel's request to unshackle Banerjee during the hearing. Finally, Banerjee asserts the involuntary medication order should be vacated because the "institutional delay" in procuring the appellate record violated her due process rights.

### I. The Involuntary Medication Order is Supported by Substantial Evidence

Individuals have a qualified right to refuse antipsychotic medication under the federal and state Constitutions. (*Sell v. United States* (2003) 539 U.S. 166, 178; *In re Qawi* (2004) 32 Cal.4th 1, 14–16.) State prison inmates may exercise this right unless "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." (*Washington v. Harper* (1990) 494 U.S. 210, 227.) Pretrial detainees are entitled to at least the same protection. (*Riggins v. Nevada* (1992) 504 U.S. 127, 135.)

The California Legislature amended section 1370 to meet modern constitutional standards. (*People v. Lameed* (2016) 247 Cal.App.4th 381, 396 (*Lameed*).) Among those amendments, the Legislature added

7

subdivision (a)(2)(B), which permits involuntary medication in three circumstances: (1) a defendant lacks the capacity to make decisions regarding antipsychotic medication, and it is necessary to protect the defendant's health; (2) the defendant is a danger to others; or (3) involuntary medication is necessary to restore the defendant to competence for trial. (§ 1370, subd. (a)(2)(B)(i)(I)-(III); see *Lameed*, at p. 396.) At issue here is the first category: the trial court ordered Banerjee to be medicated to protect her health.

## A. *Standard of Review*

A court's order authorizing a state hospital to administer antipsychotic medication involuntarily to a defendant will be upheld on appeal so long as it is supported by substantial evidence. (*Lameed*, *supra*, 247 Cal.App.4th at p. 397.) Our " 'review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands.' (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995.) Accordingly, 'the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' " (*People v. Garcia* (2024) 99 Cal.App.5th 1048, 1054, fn. omitted.)

In passing, Banerjee asserts neither the court's written order nor oral pronouncement reflects that it understood and applied the clear and convincing standard of proof. Under well-established law, this court presumes the trial court was aware of, and followed, governing law in making its decision. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398; *People v. Thomas* (2011) 52 Cal.4th 336, 361 ["In the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law' "]; *People v. Stowell* (2003) 31 Cal.4th 1107,

8

1114 [the general rule is that trial courts are presumed to have been aware of, and followed, applicable law].)  In light of the presumption that a trial court follows applicable law, a party arguing the contrary must make an affirmative showing, based on evidence in the record, to support such a claim. (*Thomas*, at p. 361; *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) That showing has not been made.  Although the trial court did not articulate the standard of proof, it sequentially proceeded through the necessary findings, even noting, "I skipped a step."  The trial court characterized Banerjee's condition as "significant" and "extreme," and observed Banerjee's progress while under the recent involuntary medication order.

We now turn to merits of Banerjee's claims.

## B.  *Analysis*

A court may order involuntary administration of medication under section 1370, subdivision (a)(2)(B)(9)(i)(I) when "the defendant lacks capacity to make decisions regarding antipsychotic medication, the defendant's mental disorder requires medical treatment with antipsychotic medication, and, if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the defendant will result.  Probability of serious harm to the physical or mental health of the defendant requires evidence that the defendant is presently suffering adverse effects to their physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and their condition is substantially deteriorating.  The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant."

Banerjee impliedly concedes there was substantial evidence to support the first two required findings under section 1370, subdivision (a)(2)(B)(i)(I):

9

that she lacked "capacity to make decisions regarding antipsychotic medication," and that her mental disorder "requires medical treatment with antipsychotic medication."

Banerjee contends there was no substantial evidence to support the third required finding under section 1370, subdivision (a)(2)(B)(i)(I): that "if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the physical or mental health of the [defendant] will result."

As noted above, section 1370 specifies that a finding of probable serious harm to the defendant "requires evidence that the defendant is presently suffering adverse effects to their physical or mental health, or the defendant has previously suffered these effects as a result of a mental disorder and their condition is substantially deteriorating." (§ 1370, subd. (a)(2)(B)(i)(I).) The statute further specifies, "The fact that a defendant has a diagnosis of a mental disorder does not alone establish probability of serious harm to the physical or mental health of the defendant." (*Ibid.*) Here, the trial court's finding does not rest solely on Banerjee's diagnosis.

In this case, the evidence overwhelmingly established that Banerjee was suffering from serious delusions, disorganized thinking, and perseverative speech caused by her mental disorder. As a result, Banerjee was "unable to rationally communicate interpersonally." This evidence established Banerjee was exhibiting symptoms of a mental disorder that posed "adverse effects" to her mental health. (§ 1370, subd. (a)(2)(B)(i)(I); cf. *People v. Wright* (2005) 35 Cal.4th 964, 970 [expert testimony that delusions are psychotic symptoms]; *People v. Pace* (1994) 27 Cal.App.4th 795, 798 [expert testimony that delusions were a symptom of defendant's severe mental disorder].)

10

In his written report, Dr. Perez concluded Banerjee suffered from a "brain disease with a deteriorating course if left untreated," which would be "seriously harmful." Dr. Perez explained that "[p]sychosis untreated will tend to worsen in psychotic symptoms and lead to the disease being more resistant to treatment," which "could potentially mean future treatments may become futile despite intense medication regimes." At the hearing, Dr. Perez testified that—based in his "experience with over 5,000 patients" who were similarly situated—Banerjee's condition would worsen. This meant the delusions would "become more pervasive and unrelenting" and would "become more fixed."

Banerjee insists this evidence is insufficient. Banerjee contends there is no evidence her mental condition was "substantially deteriorating" and that Dr. Perez's prognosis merely suggests harm in the future. We disagree. In his written report, Dr. Perez explained that Banerjee has previously suffered from the effects of her "disorganized mental state," in the form of "loose associations and flight of ideas." Dr. Perez went on to state: "Currently, all conversations devolve into incessant ramblings about paranoid delusions instead of more relevant topics. Her tangential thinking and persistent perseveration into delusions instead of having a logical conversation *most recently is evidence her condition is substantially deteriorating since she cannot communicate effectively*." (Italics added.) Additionally, Dr. Perez's opinion—that without medication Banerjee's mental health will worsen and will be harder to treat—tracks the language of the statute. (§ 1370, subd. (a)(2)(B)(i)(I) ["if the defendant's mental disorder is not treated with antipsychotic medication, it is probable that serious harm to the . . . mental health of the defendant will result"].)

11

Finally, Banerjee contends the evidence supporting the involuntary medication order was deficient because Dr. Perez failed to consider any less intrusive treatments other than "forcing" her to take olanzapine, with its numerous side effects. Again, we disagree. Dr. Perez opined there were no other viable treatments for treating psychosis like antipsychotic medication. As Banerjee was adamant in her refusal to acknowledge her mental illness and her need for antipsychotic medication, Dr. Perez concluded involuntary medication was the only option. To the extent Banerjee is challenging the efficacy of olanzapine, at most this is a conflict in the evidence, which the court resolved against her.

In sum, we conclude there is substantial evidence from which a reasonable fact finder could have found it highly probable that serious harm to Banerjee's physical or mental health will result if her mental disorder is not treated with antipsychotic medication. (§ 1370, subd. (a)(2)(B)(i)(I); *People v. Garcia*, *supra*, 99 Cal.App.5th at p. 1054.)

## II. The Court Did Not Abuse its Discretion in Denying Banerjee's Request to be Unshackled at the Involuntary Medication Hearing

Banerjee contends the trial court abused its discretion in permitting the hearing to proceed over counsel's objection while Banerjee remained shackled in the state hospital. Banerjee asserts she "was unnecessarily subjected to demeaning treatment that guaranteed [her] inability to be involved in the proceedings." We disagree.

"A court's decision to place a defendant in physical restraints will not be overturned on appeal unless there is a 'showing of a manifest abuse of discretion.'" (*People v. Fisher* (2006) 136 Cal.App.4th 76, 80.) While there are strict constitutional limitations on shackling criminal defendants *in the presence of jurors* (see, e.g., *People v. Poore* (2022) 13 Cal.5th 266, 285), those

12

limitations "are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583.)

Here, there was no risk of juror prejudice because, as the court explained, the hearing did not take place before a jury. (See *People v. Tuilaepa, supra*, 4 Cal.4th at pp. 583–584 ["We have consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury"].) The court further noted that Banerjee appeared able to communicate with counsel and stated, "if it becomes an issue that . . . Banerjee is not able to fully participate in this hearing because of the shackles, then I will address it at that time." The record reflects that no issue arose; Banerjee was able to participate in and communicate with her counsel during the hearing—in fact, Banerjee and counsel consulted during multiple breakout sessions. Neither counsel nor Banerjee raised the issue of shackling again.

Accordingly, we conclude the trial court did not abuse its discretion in denying Banerjee's request to be unshackled during the hearing. Moreover, on this record, any error would be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)

### III. The Time to Compile the Appellate Record Did Not Violate Banerjee's Due Process Rights

Finally, Banerjee contends the superior court's allegedly excessive delays in preparing the appellate record violated Banerjee's due process rights. Banerjee complains that although she promptly appealed the involuntary medication order the day after it was issued, the appellate record took six months to compile. The reporter's transcript was prepared within six weeks of the hearing. But Banerjee claims there was an unnecessary six-

13

month delay in filing the record because the "logjam occurred in the clerk's office, which is becoming notorious for delay based on the [c]ounty's refusal to adequately staff its appeals division of the superior court."

Our Supreme Court has recognized that delays in securing an adequate appellate record are "inherent in the process." (*People v. Seaton* (2001) 26 Cal.4th 598, 702.) Contrary to Banerjee's contention, the six-month delay did not violate her right to due process. (*Id.* at p. 702 [delay in appointing appellate counsel and securing adequate appellate record in death penalty case did not violate due process].)

To the extent Banerjee can be understood to argue that appeals of one-year involuntary medication orders are inevitably destined to be rendered moot before they can be decided, we note that she and other similarly situated defendants are not without a remedy. When faced with an involuntary medication order, a defendant can seek a stay of the involuntary medication order, seek expedited briefing, file a motion for calendar preference, or file a petition for writ of mandate or prohibition. (See *Carter v. Superior Court* (2006) 141 Cal.App.4th 992, 998–999; Cal. Rules of Court, rule 8.240.) Here, we granted Banerjee's motion for calendar preference; our decision will issue before the one-year expiration of the involuntary medication order.

On this record, we conclude Banerjee has not established a due process violation.

## DISPOSITION

The July 26, 2023 order authorizing the administration of involuntary antipsychotic medication is affirmed.

14

_____

DESAUTELS, J.

We concur:

_____

STEWART, P. J.

_____

RICHMAN, J.

*People v. Banerjee* (A168466)

15